May it please the court, my name is David Duke and I am a CJA panel member representing Tim Morneau. We're asking this court to reverse the district court's opinion and grant the motion to suppress, and we base it on several issues as we have briefed in the outline. Specifically, on May 9, 2009, there was a car coming from Glendive coming this way. There was a headlight that was out. Officer Quinnell stopped him. We have no problem with the stop being a legitimate stop. Officer Quinnell gets out of the car. He goes up to the driver. He gets all the customary documentation, such as the driver's license, registration. He gets that from the driver, and he also gets that from the passenger in the back seat. Now, in the front seat is my client, Tim Morneau. He's asleep, or rather, apparently asleep. I don't know if he was snoring or not, but he was asleep. Well, the radio was on pretty loudly. Is that right? At a certain point, it was. It's unclear if it was at that particular moment. And the window was open, and it was freezing cold? I believe the radio was on later on in the stop. I don't know if it was at that particular moment. I think the record is silent. Free cold? No record on that? It was very cold. Yes. Yes, it was very cold. Whether or not the radio was going on at that particular moment, I know it was going on later on in the stop. Well, it was zero. I don't know if that's cold or not, depending. It was zero degrees. Zero degrees. In Arizona, that would be cold. Officer Cornell makes two observations. One, that the two people that he did make contact were nervous. And two, that the front passenger was sleeping. Now, we know from the Ninth Circuit case law, simply being nervous is not an indication of criminal activity. In fact, in U.S. versus Chavez Venezuela, they go on to say, nervousness during a traffic stop, even extreme nervousness, is not an indication of criminal activity unless there's other objectifiable indications available. And there are none at this time. There's no furtive movements. There's nothing in plain view. There's no rappers. There's no air fresheners. There's no argument between them. There's no other indications that officers usually look for, and cite, and say, the reason why there are other objective criteria that they're using to think that there's criminal activity. In your view, at what point is there sufficient indication of criminal activity to justify a continued detention on that basis? At what point does that happen? It doesn't happen at all. Never? Never. Even when they say, would you come on down to the station so we can search you, even then they don't have sufficient justification? No, they did not have sufficient justification to ask him. He is fishing. No, no, that's not my question. My question is, at what point in the process of learning these various things does the officer have sufficient indication of criminal activity to justify the continued retention on that basis? According to the officer, it would be approximately at the 14-minute mark when he goes back and he talks to Mulder, who's the owner of the car, he talks to Mulder, and then there's these apparent contradictions in stories of what they're doing, where they're going, who they're going to see, is it a cousin, is it a buddy, where did they pick up the hitchhiker? Various conflicting stories at that point. But they are weak conflicting stories. What? They are weak. It is an officer trying to nitpick the various things that they're saying. At 7.55 in the morning, they do wake up Mulder. He's in the back seat. Mulder gets in the back of Quinnell's car and he says, look, I'm sorry, you woke me up. Does nervousness count in what the officer is examining? Does it give him a little bit of reason to ask a little more? Nervousness does count, but you have to have other objective criteria. Like conflicting stories as they emerged. The conflicting stories are not sufficient. In fact, there is that Dortch case, D-O-R-T-C-H out of the Fifth Circuit. Dortch, and it's good case law. I know that the government has said that it is weak, that it's been overturned, and to a certain extent it has been. But Dortch is good case law. It's on page approximately 23 of our brief. And that's where Dortch was in Houston, Texas, and he and his girlfriend were in a rental car, and they're very close to a trucker. A police officer pulls them over. Both Dortch, the driver, and his girlfriend, give conflicting statements about where they came from, who rented the car, how long it had been. In fact, I think the car was originally rented out of Florida, and he said he'd been in Houston, Florida the day before, and he said he'd been in Houston for two days. And yet the Fifth Circuit has concluded that even contradictory statements is not enough. And they were nervous, too. And nervousness in contradictory statements is not enough. What activities are permissible based upon the original traffic stop? Certainly, please show me your driver's license. Please show me the car registration. That's permissible. Running checks from the license. Driver's license as to who these people are, is that permissible as part of the original stop? Yes, it is. Is running the epic check part of it? I understand that there was no sort of automated system, so it takes a while for these things to come back. You know, the whole state of Arizona is in controversy of what they can do as far as epic checks and checking people, and that's what this officer was doing. We're 300 miles from the border, and he's checking a border patrol type of database. The answer is no. That is an unreasonable search of data. And that delayed this. It delayed, impermissibly delayed, this stop. Did you make that argument with respect to the epic search in your brief? Yes. I saw that you said it was unreasonably delayed. I didn't see any specific reference to the epic search. Perhaps if you can see that and respond in rebuttal, so you don't waste your time now. Going back to your argument about the conflicting stories, though, we do have circuit law in our circuit that would give credence to the fact that criminal suspicion may be sustained by a suspect giving an implausible travel story or a conflicting travel story. Wouldn't you agree? That's certainly a factor. Yes. So here you have the situation. The officer starts questioning these individuals, and there are wildly conflicting stories that are fairly implausible. Why isn't that enough? Well, I disagree with the court's characterization. It's wildly different. One of them called him a buddy. The other one's a hitchhiker. They were all going to Billings, though. They were going to go see a friend. Two of them said it was Chris Allen or something to that effect. Conflicting stories on the identity of the person to be visited. Well, two of them said the same person, and one of them, I think, said they didn't know him. They didn't know him. And then the story, was it your client, who said he had legally come across the border from Canada on a snowmobile but lost his ID somewhere? That is correct. And that's approximately 13, 14 minutes into the stop. Now, in this circuit, the case law that guides us is Turin and Mendez. Now, Mendez had their stop completely done in eight minutes. Eight minutes. And here we are, Quinnell's questioning him in the 14th and 15th minute in his car. And that's when he comes to the conclusion there's conflicting statements. So Mendez is eight minutes. He's all done, and that's considered good law. The other one is Turin, which was the Alaskan case, and that is where they went 14 minutes. Four minutes passed. What they considered was a legitimate stop. And that was considered a brief pause, and that's accepted. Here we have Officer Quinnell making these statements and observations well past the time limit of Turin and Mendez. And finally, this particular case goes on for over an hour. So even if you give the officer credence and say that he has this suspicion that these statements are conflicting, and that gives him the chance, the drastic, drastic delay of one hour before they get more no to agree to the search, that is unconstitutional and permissive, and that's a violation of the Fourth Amendment. And it would be a shame to have this upheld, and that be the case law that an officer can take that long to establish their case. Thank you. Good morning, Your Honors. May it please the court, counsel, ladies and gentlemen of the jury. Reasonable suspicion in this case, like all traffic stops, takes a few minutes to build, obviously. How about an hour? No. It may take an hour. No, Your Honor. In this case, reasonable suspicion was established prior to 16 minutes. And our position is that the district court here really answered the pivotal question in this appeal correctly, which was that this traffic stop lasted essentially 16 minutes. And by that time, Officer Quinnell had talked to all three occupants of the vehicle, and at that time he had reasonable suspicion to go forward. So what did he have at 6 minutes before the epic check? 16 minutes. I know you said 16. I'm asking about 6 minutes just before the epic check. Just before he sent in the epic check. Nervousness. Yeah, nervousness. Yes. He wasn't sleeping. Yeah. And that was it. He had a guy sleeping with the door open, obviously. Loud music was playing. Was the door open or just the window open? I think the window was open at first, Your Honor. And when was the door open? I think the door was open after he had wired in the epic check. Okay. I couldn't find any cases that said that odd sleeping habits gave rise to reasonable suspicion. Do you have one for me? Your Honor, I have a good case, but it's not exactly on that point. It's the Arvizu case, in which case the United States Supreme Court said, you can't divide and conquer these things. You have to consider them all together. So if we consider a sleeping occupant of the vehicle on its own, that might not be terribly suspicious, but we have to consider the circumstance. And you have to understand, our position is those circumstances build up until the 60 minute mark. But get back to your question. I'm drawing a different line because the epic check may be a different question. I mean, it seems to me, and I may be wrong, that all you had prior to the epic check was he sees they're very nervous, those who are not pretending to be sleeping. He sees an occupant who's pretending to be sleeping in face of adverse circumstances. And he just senses something's wrong. And what we have up to about six minutes. Yeah. We also have this gas can in the back window. And if you look at the video, and it's pretty clear. A gas can in the back window? Yeah. What does that add to it? Well, it's interesting because when you look at the video of the stop, you could tell the officer after he first looks at them, and goes back and he's just heading back to his car, he turns and he looks and he sees that gas can. And these are three guys that have just basically told him they're heading to Billings. And so you could tell that that had some trigger in his mind. Like, you know, I probably need to do some records checks on these folks. And getting back to your issue. Excuse me, what does the gas can have to do with it? Well, I think he testified in the suppression hearing that he just found it kind of odd that there was a five-gallon gas can in the back window of this vehicle. And these are three guys who are heading from Winnipeg to go shopping in Billings. That was the initial suspicion that he testified. I thought, well, you know, I should probably not only run the one name, but I should probably run the two. Right. Now, let me interrupt you for a second. At this point, though, he's already told them, I'm only going to give you a warning ticket. Yes. So he's already decided what he's going to do on the headlight. Yes. That investigation is over, correct? Well, he still had to run the records check. No, no, but I mean, as far as the violation, all the investigation concerning whether the headlight was out. Yeah, the headlight violation was complete at that point. At least they hadn't turned their headlights on. At the end of the day, none of this would have happened, right? Yeah, well, they never would have been picked up, obviously. And, you know, they answered, willingly answered a number of his questions. So then he does the records check, and there's no adverse records, and he's informed that Canada doesn't maintain an automated system. Yes, sir. Why doesn't it end there? Because by that time, they had all these conflicting stories. No, he doesn't have the conflicting stories yet. Because what happens, and if I'm reading the record right, is then he asks for an epic check, and that's what extends it. Now, the question then is, does an epic check, and that's a border crossing check, is that a permissible extension of a traffic stop? And I haven't seen any case law to that effect. And, of course, as counsel mentioned, that's at issue in Arizona right now, that state officers are not entitled, or should not be entitled, to federal enforcement of immigration law. So why did the officer do the epic check? And what did it have to do with anything? The epic check certainly is relative to when this vehicle crossed the border, if it crossed the border, legally. And why is that relevant? Well, obviously, it became relevant in this case, because more or less, it wasn't in the car when it crossed the border. But at the earliest stages in this case, the officer had to make a determination as to, I feel I have enough suspicion about this to at least do some record check. And, of course... That's perfectly permissible, but I don't think we have a case that says that a state officer can extend a traffic stop in conducting a federal record check of border crossings. It's not that it's maybe... It wouldn't be good case law or bad case law, we just don't have any case law that I've found. There is Supreme Court case law that a records check... But it's directed toward immigration checks. Sure, but most traffic stops don't have to do with people coming down the highway from Canada, either. I mean, this is obviously... But the position... Sorry, but this does have a profound effect, because although we're talking about Canada, Montana, down on the border, there's a large issue about this very topic, and we make law, of course, for the whole circuit. So it's actually a fairly important issue. About whether or not you can prolong a traffic stop that's completed, and you've done all your normal records checks simply because you think the person is a foreign and do a record check. And I understand, Your Honor, your concern. The problem is there is no other records check. There was no other records check available. I mean, that was the only records check he had readily available. And under the circumstances and constitutionally, if we look at the Arvizu case and the Terry case and the Sharp case, it's clear that there's some play in the Fourth Amendment that would allow an officer to seek the best source of information because he feels obligated to do a records check. And this is the records check that's available to that officer at that given time. But it's not the records check that's an occasion as usual. It's not. I mean, you're doing a records check for traffic warrants, right? Maybe an outstanding warrant. An officer testified in this case. He was not looking for outstanding warrants when he did an ethic check. He said that. Yeah, he was looking for some information on these folks. And ordinarily, as I said before, we don't have people coming in from Winnipeg to shop in Billings. So you don't have the border situation that you would in a normal traffic. Now, did they say they were coming to shop or did they say they were coming to visit somebody? Initially, they said they were visiting a buddy who turned out to be a cousin who was later named by the sleeping man who neither of them. But the reason I ask that question is at the time he decides to run the ethic check. Yes. Was the story that they'd come down to visit a buddy or to shop at that point? It was a buddy. Yeah. Yeah. Although it's really a little bit unclear, given the video, because you can make out that there are some words going on and it's a little unclear. And I don't think that it was covered in great detail in the suppression hearing as to what exactly was said in those very first moments. But I think it was a buddy. And that's what the district court. But if we're talking about the oddity, then the oddity is coming down from Canada to visit a buddy in Billings rather than coming down to shop. Yes. And the additional oddity, of course, was added after they had spoken to Lauren, the driver. But as to this ethic check, you know, the case law is, I think, is pretty clear that it is expected in a traffic stop that there will be a records check. What's your best case that would extend it to the ethic check? Give me your best case from any jurisdiction. I'm relying on the Mendez case that talks about generically a records check. I'm relying on the Berkemeyer versus McCarty case from the Supreme Court in 1984. But those cases make the point that it is routine in a traffic stop that the stopped party can expect to have a records check. That's part of the hindrance that we all put up with when we're stopped along the highway. If we drive to Canada and we cross the border, I would expect that the Canadian authorities would have difficulty and would have to check some sort of border information as well. Now, one thing that occurs to me is unless I missed it in the blue brief, there was no specific objection made on the basis that an ethic check is not a permissible records check. Is that question properly before us? Your Honor, the ethics issue as to when it was initiated was not raised, in my view, from the record. And under Ninth Circuit law, United States versus Wright, if you don't raise it in that context, it can be waived. And it should be waived. But what they raised generally was that there wasn't a reasonable suspicion in those first few moments. So I don't know if that could be construed. Obviously, the district court found that we have a window here until 16 minutes, and during that period, obviously, suspicion arose. Shortening it down to the four or five minute period when the ethics check was made obviously limits the view of that information. It's somewhat a different question. And I don't think the district court ruled on that, and I don't think that was squarely placed before the district court. Okay. Any further questions? Thank you for your argument. Although, Mr. Johnson, I'm disappointed. You think it's improbable that Canadians would come down to shop here. Very. You know what? When I read that it's not true. When I read that three young men were going shopping together, I didn't believe. There's a follow up on the epic search. Even though the twin now got back positive, reinforcing information, showing that the individuals in that car were telling the truth. He rolled right over it and kept on his one view of trying to determine whether or not there was drugs in the car. It turned out he was right. It turned out he was right. And that's a great point, Your Honor, because the exclusionary rule is always going to have somebody that shows up here guilty. They're always going to show up here having either pled guilty or gone to court. That's how these cases get here, and not whether or not it's one pound of ecstasy or 150 pounds of ecstasy. We're past that. I mean, the ends do not justify the means, just because this officer is particularly correct. And that's fundamental jurisprudence of the exclusionary rule, and that was something that I was going to bring up. Just because there was drugs in the car doesn't mean that there wasn't a violation of that. I see that my time is up. Thank you, Counselor. Thank you. Patients are to be submitted for decision.
judges: O'connor, Thomas, Fletcher W.